Please be seated. Good morning everyone. I'm Judge Park, here with Judge Jacobs and Judge LaValle. We have just one case on the calendar for today, and I understand that all counsel are present, including one virtually. So you need to call roll. We can get started whenever you're ready. So I think first up will be, let's see here, Fikes Wholesale. Masks optional today, so just so you know. May please report. My name is Nathaniel Tarnar, and I represent Fikes Wholesale Incorporated, other small branded operators that sell retail gas on behalf of major oil brand franchisers. I also represent several associations that represent the interest of thousands of other small fuel retailers across the United States. This court should reverse the district court's decision to approve the class action settlement. You also represent other small retailers of gas. Are they all sellers of branded gas, of historic or not? Yeah, so many of them have a mixture of their own franchise, the major oil brand, company oil that they sell, or some of them can be independent. But it's a large number of franchisees, and I also represent these associations that are trying to protect their interest. So this court should reverse the district court's decision to approve the class action settlement for several independent reasons. First, the district court abused its discretion when it approved a vague class definition that is not ascertainable and creates a fundamental interclass conflict between hundreds of thousands of franchisers and franchisees that cannot determine whether they are included within the class. The class definition includes all merchants that accepted payment cards, but it fails to specify whether this includes merchants that accepted payment cards at the retail level or related entities like Shell and other franchisers that accepted payment cards for processing from retail merchants. As a result, thousands of small franchisees will be stuck in a process with no resolution and no adequate representation. Franchisees should not have to wonder whether they are in the class and whether they will be recovering their fair share of the settlement. They shouldn't have to endure another layer of litigation. You're saying that this problem arises because of the application of Illinois BRIC? We're saying this problem arises because the class definition is not ascertainable. It's vague. It's based on all merchants that accepted payment cards in this case, and given that the franchisers and franchisees have a dispute regarding who accepted the payment card, whether it was the franchisers payment mechanisms and their processing systems, or at the retail level, the independent merchants that accepted these payment cards. And because of the conflict between the definition of except here, it essentially is going to create a whole separate area of litigation by small independent businesses that really have no ability to ascertain whether they're in the class or not. So class who is in the class, and they should resolve these issues before the settlement. Although class counsel now claim that the settlement agreement must be interpreted using federal antitrust law, and that it only covers direct payers. What's the specific remedy that you would have here? How would you fix the definition or the representation to address the issue? The settlement agreement needs to be remanded so that... I know that's what you want, but specifically like in terms of implementation, how would you do it? Well, they would need separate counsel to represent their subclass interests. Who's they? The franchisers, the franchisees, so that they can sort out exactly who is covered by the settlement here. Do we need to cut those subgroups up by time period too? I don't believe it would require being caught up by time period. The key issue here is just simply the settlement agreement itself is vague and unascertainable. So some, it needs to go back and essentially be redrafted from scratch so that this can get sorted out. Unlike many other settlement agreements involving what parties claim are direct purchaser class actions, prior settlement agreements... I guess where I'm coming from, there's like 12 million merchants in the class here. It seems like there's always going to be some that don't know whether they're in or out or that believe that there's some conflict of interest or inadequate representation. Is there some kind of materiality threshold or how do we deal with that? Here the record shows that there's approximately over half a million folks that can't determine whether they're in the class action or not. Just given, you know, the sheer size of that group and the fact that the settlement agreement was not drafted in an adequate manner, just like the court overturned the first settlement, class counsel needs to step up to the plate and do a better job making sure that people who believe that they were covered by the settlement agreement can sort out whether they will indeed get their fair share. Why can they not tell? What is it that makes it impossible for them to tell whether they're in or out? It's simply the vague way that the settlement agreement is... Well, be more specific. So, it refers to all merchants that accepted hidden cards. All merchants that accepted hidden cards. If you'll note the record back in 2014, that the parties themselves raised this very issue and simply swept it under the rug. And they mentioned that there was going to be a dispute between franchisers and franchisees about exactly who was the party that accepts the payment card in this case. And unfortunately, because they want to get a deal done here, they swept it under the rug, and you now have thousands of small merchants that are stuck in a situation where they do not know if they're going to be covered under the class settlement, where there may be an entire other layer of class council representation. You're assuming that they're going to be involved, each one, in a litigation. So, I understand the mechanism. Do correct me if I'm wrong. There will be a special master appointed who will look at the governing contracts and decide, in the case probably, you know, by the thousands, whether it is the oil company or the gas station owner that will get the amount that's going to be paid for those transactions. And that may well take place without a further effort by your clients. They'll put in a claim like everybody else, and they'll either get paid or not, like everybody else. Well, the problem here is, and the record reflects, the contracts don't cover this issue. It's not an issue of antitrust law or contract law. It's poor drafting on the settlement agreement here of which party accepted the payment. So, you're saying a special master would simply have to flip a coin in order to decide? They have no standards. It's vague. There's no procedural framework that's been set up, and it's essentially that the district board has dumped this on the lap of the special master with no framework for the parties to even understand whether they're going to be in the class at all. And to put that on thousands of small retailers to try and sort this out without being able to have representation in this context, we believe is completely unfair. Am I correct in believing that one of the things you point to as the reason for this problem is that the application of may look as if they accepted the payment will be deemed to be not the not the primary purchaser under Illinois BRIC and will be then excluded from the class? Yes, so under Illinois BRIC, they could theoretically be covered by this or they could not. So, the answer to my question is yes, that's part of the problem that you're pointing to. Amongst other problems. Amongst other problems. Yeah, so the reason I ask that is that I would like to throw out for as an issue for council to discuss in their arguments, to the extent it's pertinent to their issues, that I have a question whether this is a circumstance, the issue as between service stations that sell the gas they sell, I have a question whether this is an appropriate application of Illinois BRIC, because as I read, as I understand Illinois BRIC, it did not say a broad proposition. There can, in all circumstances, there can be only one plaintiff for a particular injury. What it said was, it pointed to the most common situation, which is where the antitrust violator is selling something, let's say it's a product, and it sells it initially to, let's say, a major wholesaler, and that major wholesaler then sells it to local wholesalers in different areas, and those local wholesalers in turn sell it to retailers so that you have a sequence of sales, but the antitrust violator is making a sale only to a first purchaser, and what the antitrust, what the Illinois BRIC rule says is, in that circumstance, only the direct purchaser, only the first one is eligible to be an antitrust plaintiff, but it seems to me there's a serious question which has not really been addressed in the district court. It seems to me that everyone has kind of assumed that the Illinois BRIC rule will apply here in a manner that requires that only one of the oil company and the service station be the plaintiff, and if you're not the one that's going to be the plaintiff, you're going to be excluded from the consequences, but this is not the kind of a circumstance that the Supreme Court was addressing in the Illinois BRIC, where there's a ladder, a sequence of first purchaser, second line purchasers, third line purchasers, who all might argue that they're entitled to be in there. This is rather a circumstance, it's more like a kind of a partnership at the time of the presentation of the credit card for payment at the pump. The varying interest, potentially varying interest, as between the service station owner and the oil company will determine whether the credit, whether the payment coming from the credit card company or the payment card company goes to the other direction, and it's kind of like there's a partnership of interests that are represented by the how that payment comes out, and I don't see that as within the rule established in Illinois BRIC, so that I have a question whether both, whether the job of the special master should be to decide in the case of the conflict between the service station and the integrated oil company, the special master should decide what portion of the recovery for that particular set of credit card payments should go to the one and what portion should go to the other, rather than saying everything goes to one and the other is excluded from the class with consequence that it can't bring action, well, with the consequence that it's left to its own devices to secure relief. Your Honor, I'd also like to note, in addition to those issues, that the complaint itself incorporated California clauses of action, which allow for both purchasers here, and so the parties to the subliminal agreement have argued vigorously that the complaint in the subliminal agreement have to be interpreted only by federal antitrust law standards, but because California clauses of action are incorporated within the complaint and are covered by the subliminal agreement, we have the issue of both direct and indirect purchaser's claims that are covered by that complaint, and therefore, when trying to interpret who exactly is covered by each transaction, and given the parties to the subliminal agreement saying that only one party is supposed to recover here, it's created a tremendous amount of confusion for these small retailers who didn't know whether to object, whether to try and consider some of the other alternatives that they had, and the biggest challenge here is that it's essentially going to create a large mess for thousands of small businesses who just do not know whether they are covered here. I see that my time is up. Is it correct that if the Illinois BRIC rule is deemed not to apply in the circumstance of fuel sales, gas sales at the pump, at a service station that sells a major oil company brand of gasoline, Exxon, Chevron, Shell, something like that, that the problem, at least some of the problems you're talking about would be cured if the job of the special master and of the district court ultimately is not to decide which one gets the payment, but how the payment should be divided between them? Well, the challenge here is that the settlement agreement uses the word accept, and if they both accepted it, they should… Sorry, it's hard to hear you. Yeah. Try to… Does that… Yeah. Does the podium lift up so that you can… I'll try with the microphone here. The issue here is that the settlement agreement uses this broad term, so if it's possible to ensure that everyone is covered and everyone gets paid, that would be wonderful. The challenge here is that the parties of the settlement agreement have said that only one party per transaction can recover, and they both feel that they are entitled… The settlement agreement says that? That's what they have said. Only one… The settlement agreement doesn't say that. That is how they're interpreting it. Yeah, but they're interpreting it as an application of Illinois BRIC. The settlement agreement doesn't say only one party per transaction can be in the class. It's not in the settlement. If everyone who accepted these payment cards and the broad framework of that term, we wouldn't have this problem. But the courts and the parties have said that only one party is supposed to be recovering here, and that's the real challenge. Okay. Thank you, counsel. Thank you. We'll hear next from Counselor Jack Rabbit. May it please the court, my name is Albert Backrock. I'm here for Jack Rabbit and Caharva Heights Chevron. Our issue is Illinois BRIC, so I'll be glad to discuss Illinois BRIC with the panel. Our other issue is Article 3 standing, which is probably more important to the panel because, as defined, class members do not all have Article 3 standing. Article 3 standing requires a concrete entry. The concrete entry is attributable to the retail gas stations that I represent, and based on information about how the industry works, all other retail gas stations. My retail gas stations are not in a partnership with Chagall or any other integrated oil distributor. They're not partners. What happens in real life is you enter into a contract with the oil distributor. The oil distributor provides the pumps, which have the built-in mechanism for accepting credit and debit cards, and they also put in the cash registers inside the food and sundry store that go with most modern gas stations. When a customer purchases gas at the pump, that transaction is processed through the oil company's account because it's, in fact, their cash register mechanism that's at the oil station. But by contract, under Illinois BRIC, the damage goes to my client, who owns the oil distributorship, because all costs from the banks, the merchant bank and the acquiring bank in this matter, are passed on by contract from the oil distributor to my client. So under Illinois BRIC, the convenience that the Supreme Court created for the federal courts, that only the first person in line would be considered the direct purchaser, has the exception for the cost plus direct purchaser, which is my client. The Supreme Court says in Illinois BRIC that that exception, because it moves the entire cost of the antitrust transaction to the second person in line, the person who would be an indirect purchaser otherwise, makes that person the direct purchaser for Illinois BRIC and antitrust purposes, and the first person in line is not in line at all. So does the meaning of who accepted the card depend on the contract provisions regarding the fee, who bears the brunt of the fee? If the question is under the definition of the class who accepted it, you would have to say the person who accepted it is the person who actually paid it. There's a conflict between the language the class counsel and the defendants used and the language of the Supreme Court in Illinois BRIC. The concept of antitrust law that was clarified by Justice White in Illinois BRIC was that at that time, it would be economically unfeasible and require more from the district court than the Supreme Court thought it should allow to figure out what percentage of the antitrust violation gets passed down the line from the original purchaser to their purchaser to their purchaser to their purchaser. So what Patterson and Illinois BRIC really stand for is the simplification of deciding who is the injured party under antitrust law. The Supreme Court says that the injured party is the first person in line unless the first person in line has a contract with the second person in line that Patterson won their cost plus a profit to the second person. That's exactly the situation we have in this case. I'm still confused. I'm sorry, maybe I'm just misinterpreting. So I understand your argument to be that accepted is ambiguous or unclear as applied to your clients. And I think your adversaries are saying, well, against the background law of Illinois BRIC, it's actually clear there's only one or the other. And I thought your argument was that it depends on the contract as a factual matter. And I guess I'm confused about the interplay between whether this is a legal question or whether it's a factual question, that the contracts between the gas stations and the oil distributors matter. Well, it's a legal question, and it came up with the district court, and they decided not to answer it. The district court said when I was at the fairness hearing, why didn't anybody bring up the issue of Article III standing before? Why am I hearing this now? And I couldn't answer that. I'm not class counsel. I'm not the defendant. I don't know why no one raised the issue of Article III standing at any point with the district court. But before the district court can make any decision, including approving the settlement, that's the Article III standing. Our position is that only the injured party in an antitrust suit has Article III standing. That accepting isn't ambiguous in the sense that we all know what it means to accept a credit card. But the issue is who is damaged by that acceptance? There's two parts to it. And if you're not damaged, you don't have Article III standing. And under Trangini v. Ramirez, and under this court's Denny v. Deutsche Bank in 2005, every member of the class has to have Article III standing at the point of class certification. I'm not sure I understand or agree with your application of the notion of Article III standing. If there is an artificial rule of, well, let's say you have somebody who has been damaged by a certain type of conduct or pleads in a manner that's plausible, that that party has suffered injury as a result of some kind of illegal conduct, as a general proposition, that party has Article III standing. Now, it could be that as a result of an arbitrary rule of law, I mean, in the sense in which all rules of law are somewhat arbitrary, they result from being passed by a legislature or a court's decision or something like that, as a result of such a rule of law, the answer may be, sorry, you may be injured, but you don't get any recovery because the law doesn't allow someone in your circumstance to get a recovery. It doesn't mean you haven't been injured. It just means you can't get a recovery. That party still has Article III standing. So, it seems to me what you're talking about is whether parties have antitrust standing, not whether they have Article III standing. If they're alleging that they were hurt by increases in prices and they make a reasonably palpable argument to show how they were injured by somebody's illegal conduct, they have Article III standing, if it's a sufficiently clear injury. I certainly agree, Your Honor. Even if the Supreme Court has said, in Illinois BRIC or any other case, no, you can't be a plaintiff in that case. That's a different issue. That's the application of a rule of law, and you can call it antitrust standing, but it's not Article III standing. I would take it differently. I would say that at the pleading stage, that what you're saying is absolutely correct. You look at the four corners of a complaint, and you determine whether or not the person has pled that they have an injury cognizable by the federal courts, a common law or equitable injury that's been traditionally recognized by Anglo-American law. That's clearly correct. But then, as the case develops, and especially with a class action, at each step along the way, the district court is tasked with determining whether or not the plaintiff has Article III standing, and whether or not, as we get to the end of the marathon, and a class is either certified by the court or certified for settlement purposes, it has to be considered whether or not the plaintiffs have Article III standing, and whether the class members have Article III standing as well. And that standing always goes to whether or not the person has a concrete injury cognizable by the American judicial system, the federal courts. So, if this were injunctive relief, I wouldn't be here. It would be obviously correct that you don't have to have the same kind of injury for injunctive relief to apply to a class. But here, we have damages. It's true the damages are under the antitrust law, and the antitrust law is interpreted through Hanna-Persu and Illinois Brick, but that's not a random, just happens to be. It's the law of the United States that only one person per antitrust injury. So, if you are not the person that's injured, then you don't have Article III standing. And at all times, after the discovery phase of this case, and at all times since I've been involved in it, we were telling the district court that they had a problem because they had allowed a class, or were going to allow a class. They consisted of people who had a concrete injury that actually paid the overcharge by the payment card companies, and that you had another large group of people who didn't suffer any injury at all. So, they had no Article III standing. They can't be part of a settlement class because nothing happened to them. If I am the oil company, Your Honor, and you are the retail gas station, and our relationship is such that I never pay the actual fee to the banks, and you always pay the fee to the banks, you're injured and I'm not. And the whole point of Illinois Brick is, we turned to another member of the panel and said, and you came to the gas station and bought gas, and the price of the pump reflects the overcharge on the payment card, so you too were injured. The Supreme Court says, yes, but you don't get any damages. You're not in the class either. So, my clients, Jack Rabbit and Haber Heights, Chevron, they're in the class. They could be plaintiffs. The oil distributors are clearly not members of the class. They're clearly not injured. They clearly do not have Article III standing. And the Supreme Court's analysis, and Judge Kavanaugh went through for like 15 pages last summer, and spoke well over your time. You have a minute for rebuttal that you preserved. You can use that now, or we'll hear from you after. I'll go now. Judge Kavanaugh, in his decision, went through the historical development of Article III. And as I understand what Judge Kavanaugh said in TransUnion, not only did he agree with this court's decision in Deutsche Bank that every class member has to have Article III standing, they explained why people who appear to have Article III standing don't have Article III standing. And that's how they eliminated those thousands and thousands of people who had the wrong information about being terrorists in their files at the three major credit institutions that talk about people's credit worthiness. But they weren't injured, because during the requisite time period, there weren't any inquiries about those people. And so the fact that the information existed, but wasn't disseminated, knocked them out of the class. It was the dissent in the Ninth Circuit. So in our case, this court has to remand this matter back to the district court, so the district court can address the issue of Article III standing. The issue that was raised to the district court at the fairness hearing was never addressed. And when that happens, what do you want the court to say? Well, I want the court to say... I'm asking you. No, I understand. I want the court to say that, upon reflection, Article III standing belongs to only one injured party per transaction. And in the case of retailers and oil distributors, that one party is the retailer. And the oil distributors can't be class representatives. I understand. Thank you, Your Honor. You don't want us to say that if the last part of it is that your clients are not the injured party, but the other party is, the distributors. You don't want us to say that you don't have Article III standing. You want us to say that the other party doesn't have Article III standing.  But I don't believe the panel will make that determination for the district court. But if you did, yes, I want you to tell the district court that not only does it have to make the decision about Article III standing, it has to apply Illinois brick and its cost plus direct purchaser subpart or exception to our client. We have standing. They don't. We get the damages. They don't. Yes, I would welcome panel to say that. Thank you, Ken. Thank you, Your Honor. We'll hear next from Gnarlywood. Mr. Jan? Yes. Good morning, Your Honor. My name is Kendrick Jan. I represent Gnarlywood LLC. They have joined in briefing with Unlimited Vacations and Cons, which intends to be dealing with the attorney's duties instead of award concerns. I would like to deal with the substance of the process that should take place. This matter was before the court in 2016. This matter was before the court in 2016, and it was determined that, though the settlement brought B-2 relief and some B-3 relief, there had been a conflict between the interests of B-2 subclasses and being represented by common counsel. That created a problem with adequacy of representation. I don't think we misstated that. The B-2 class is pursuing injunctive relief on a separate track, and this case is backed here with an issue of allocation of monetary relief between present and future claims and counterparting an adequacy of representation concern, once again. The extended release period runs from... Am I inferred? I'm sorry. I just didn't... I saw it on the earphones, so I want to make sure it's okay. Thank you for giving. The extended release period runs from January 2019 through at least March of 2027, but the present and future claims, which are the exact same legal merit, have been differentiated by an artificial color cutoff date. Someone needed to advocate for the future claims. No one did, and they were barred in a way. The issue had been resolved had a post-2016 merchant been appointed to represent the interests of the numerous and growing class... members of their class merchants who would never have agreed to a compromise of future claims without compensation. Instead, an allocation decision was made, and neither class finance nor class counsel can give any assurance that they advance the strongest arguments in favor of those future claims. The result of the allocation decision is that class plaintiffs, older merchants, and including persons who have now ceased doing business will have a much greater share of the net recovery than newer and growing merchants, who will continue to suffer the same damages according to the same reported antitrust misconduct of defendants throughout the extended release period. The district court did an examination... I guess I have the same question for you that I did for Fikes, which is where would you draw the line? How is it that you would do this differently? A subclass for the newer merchants, what does that mean? Ultimately, it's a subclass issue, I suppose, but it could be couched in terms of claims and the concern is you're apportioning more for old claims and zero for new claims. So some provision needs to be made for the new claims. Where's the line between new and old? The new and old is probably 2016 when this case was back to the courts, but new and old really is a function of it could be the 2019 cutoff date and the actual conclusion of the extended release period because that's where the equally meritorious claim continues to accrue and they're uncompensated. So you could take the net settlement fund and divide it proportionally across the term of the entire release period and set aside a fair percentage of that net settlement fund to provide for future claims. Is that still a fair apportionment? It's unknown, but it doesn't have to be perfect. So if you were to take let's say 20% of the net settlement fund and send it over to satisfy future claims, that would I suppose be a reasonable approach. That or you simply cut off the extended release period or you extend the payment period through the entirety of the release period. But here, where the court has determined that a pro rata payment is equitable that's basically the whole of its E2D analysis. A pro rata payment is equitable and so we find it satisfies E2D and really the whole of its analysis, the quotation of the two considerations that the 2018 Rules Committee laid out regarding the apportionment and the relationship to differences in claims it disregarded what it had quoted and simply said I find a pro rata distribution here to be equitable. But it didn't consider that the pro rata distribution didn't contemplate the full measure of release claims or the full horizon here in this case. It certainly is not all an equitable distribution. Now, if you look at how the court reviewed identical factual predicate inadequacy it kind of made this generic holding that because you have an identical factual predicate you are allowed to release claims and that's A7375 but then it did I spoke in its preliminary memo in order of preliminary approval in January 2019 said the interests of the class plaintiffs are not antagonistic to peer to class members. A, they are adequate because they are all Visa and MasterCard accepted merchants didn't discriminate between old and new just that they continue to operate as merchants they continue to accept the payment forms and then it said made this finding their interests are not antagonistic to peer to class members citing that all Rule 23 B3 class plaintiffs and members of the Rule 23 B3 class will have the same incentive to maximize cash compensation for past harm. That's the court's finding but the court never stopped to consider that in fact newer and growing merchants are much more interested in compensation for future harm. So the issue of adequacy of representation is clearly explained the court went on in its analysis and I would say that its review of adequacy was more focused on class Council's 23 E2A procedural adequacy analysis competence experience negotiation and use of experience mediators all of which I don't really have a dispute with the question is whether or not the adequacy under 23 A4 of class representatives in terms of the class Council is deficient because they ignored the interest in future claims that the newer and growing class merchants have which are completely eliminated by virtue of a settlement that favors the older class merchants class plaintiffs and those that are no longer in the business now the same set of problems can be looked at through the 23 E2B analysis which the court as I say very summarily did in one brief paragraph at A7380 quoted the consideration points stated by the 2018 rules committee but did not examine them at all before concluding the court finds that the prorated distribution scheme is sufficiently accurate. Would your objection be satisfied by eliminating that feature of the settlement that relieves the defendants of liability for claims that arise in the five year period after the settlement is effective? Yes. If you reserve to the class members the right to recover for future violations then a prorated distribution is for claims that are suffered during a limited time and that is equitable because they have the right to recover for ongoing or future accruing claims. And would this settlement survive in any form if we made such a ruling? I don't know. I would guess the defendants are more concerned with the length of the release than they are with who enjoys what share of the relief that is due. Although you can say we are going to disallow the foregoing release of claims and we are going to cut it off in January 2019 which would parallel the claims period so we don't have an extended release period then I would guess the defendants would get pretty hot and bothered by that. On the other hand, if you say we are going to extend compensation, the release is going to be shared more fairly across the board for present and future claims suffered during the past and the extended release period combined. I don't think the defendants have a problem with that. The question is whether or not plaintiffs and class counsel have a problem with that. I don't see why they wouldn't because it is obviously in the greater interest of the collective class in equitable distribution of that cover. Does that make sense in that comment? Other than that, Your Honor, regarding the 2018 rules where they recommended a portion of relief taken into account for differences among their claims is something that if that is done then an equitable apportionment is more easily seen. Here, however, there is an apportionment of relief that has absolutely nothing to do with the distinction between the claims. Consequently, pro rata relief Mr. Jan, I think you hit mute or we can't hear you anymore. Mr. Jan, can you hear us? We've lost audio. Do you hear us? Mr. Jan, can you hear us? Hello? Hello? Mr. Jan? We can't hear you. I'm doing my best to pass the mic but I'm afraid we can't hear you. It must be on his end. Okay. Well, you're well over your time in any event. You've reserved a minute for rebuttal so we'll move on and hopefully we can get this fixed in the meantime and have some time to figure it out. Thank you. We'll hear from Etsy later. Yes, may it please the court. John Pence on behalf of Pets USA and Unlimited Vacations. May I suggest that it wasn't just the B2 class that was prejudiced by the conflicted representation that existed prior to 2016 but the B3 class was seriously prejudiced as well and they were harmed in four ways. First, the obvious way. This is an inferior settlement. I apologize, Your Honor. Mr. Jan, we lost you for a few minutes there. Yes, forgive me. Well, you're over your time anyway so you've reserved a minute for rebuttal and we'll move on. Thank you, Your Honor. I don't know where you lost me but I apologize. No problem. Thank you. This is obviously an inferior settlement for the B3 class because it is $100 million less. It was a $5.7 billion settlement in 2013. At the time, Judge Gleeson approved that. It has now come back with six intervening years at $5.6 billion. With the time value of money, that prior settlement would be worth over $6 billion today. The class has been expanded by 4 million new businesses. There's no interest charge? Is interest going to be added to any judgment? Well, I'm not clear on that. Whether it's currently in escrow, I assume it would be. Does the present figure include accounting for interest or time value of money? Probably from the time it was approved until now. Between 2019 and now but not between 2019 and now. The class has now 4 million businesses added and the claim period is 6 years longer. There's 6 more years of transaction fees that are going to be paid out so it's been diluted. The biggest way that they've been harmed is they're still being asked to subsidize the attorney fees that were incurred on behalf of the B2 class. That occurred back in 2012 as well. The class counsel included all of their fees and they were taking them all out of the B3 recovery and nothing out of the B2. It wouldn't be out of the B2, it would be in a fee-shifting proceeding for the success on the merits. This court said in 2016 the B3 class has one interest only and that is maximizing the cash recovery for past harm. One way of maximizing recovery is minimizing the attorney fees taken out of it to a reasonable amount based on the actual lodestar that was necessary to create that recovery. Mr. Wildfang in his declaration said market reform was the primary goal of the litigation pre-2016. He was very candid about that in his 2013 affidavit. He said recovering money was a secondary goal. His affidavits are full of descriptions of things that he undertook, legislative lobbying. In Washington D.C. he worked on the Durbin Amendment, he assisted the DOJ in various prosecutions. The district court said that the majority of class counsel's work leading up to the 2013 settlement agreement would have been aimed generally at proving an interest violation. Isn't that a fact-finding that we would review for clear error? Your Honor, it may be, but I believe it is clear error when compared against those affidavits. There's no way that one can say, well, first of all, Judge Brody said it was a majority, so that's a concession, I think, that some of that time, and clearly the time spent on extrajudicial things probably should have been included, and there was certainly necessarily a lot of time spent obtaining the injunctive relief. And I think class counsel had an obligation to present its lodestar time in a way that made it easier for the judge to segregate those two categories of time, and it seems to me that the fact that they failed in that, the remedy the judge chose is, well, I'll just allow all of it in, when clearly, in Stilburger, this court held that one appropriate remedy is to exclude all of it because, number one, it was conflicted time. I understand that it may not have arisen deliberately, or the class counsel may have not seen that coming, but... Well, the class counsel couldn't have seen it coming, and it was not written in stars, and there's no finding of ethics violation. No, I understand that, Your Honor. There was no ethics violation. There was a technical conflict that had to be corrected, but there's no ethics violation. You're correct, Your Honor. There isn't an ethics violation, and I believe that a complete exclusion of the pre-2016 lodestar would be a harsh remedy, but... There's 650,000 hours. How would somebody go about apportioning those things? Well, for a lodestar cross-check, you don't have to engage in that intervating, cumbersome, line-by-line line item detail, but you can do a rough estimate, and that's what many judges have done before. The easiest one that springs to mind is 50-50. The lodestar cross-check was based, really, entirely on the risk factor in undertaking a recovery that yielded a specific amount of a fund. So, how would that be affected? I mean, I don't... No, I understand if you do it, but I'm not sure I see how it can be done. We're talking about a percentage fee here, and therefore, the impact of this, whether you can count this lodestar or not, is on the lodestar cross-check, but we've argued that if that time is properly excluded, your lodestar multiplier now, especially for a mega-fund case, starts to push above 5, and that's just not... I don't think that's permissible here. That's not within the range of reasonableness. Judge Gleason awarded a 3.5 multiplier back in 2012, based on the risk of the case. I think that would be a sensible maximum multiplier here. But if their lodestar for the B3 case is $100 million, then that means the fee should be $350 million, not $523. I think it does impact the fee. I think for Judge Gleason it was a limiting factor. I don't think there's some magic about 9.5. I think if you look at the other billion-dollar mega-fund cases, I think you'd come out with the mean, or average of somewhere around 6%, and therefore, I think a 6% fee would be perfectly appropriate here. I hear you, and if I agreed with you, I would be exercising discretion. But we don't have that discretion. That discretion lies in the district court. What is the principle of law that you think we should articulate that would guide that discretion in the direction you think the award should go? The principle of law would be, unless we know that the lodestar was calculated accurately, we can't be sure that the district court would have blessed a fee that represented, for example, a multiplier of 4. Clearly, the lodestar is exaggerated. It includes items that should not have been included in the lodestar. Under needle trades, you can't include any time that wasn't spent obtaining a judgment or a consent order. And most of these things, I mean the Durbin Amendment, the amicus brief, the DOJ, that is time spent perhaps for the benefit of the B2 class, but unless it resulted in a judgment in this court or in the lower court here... But why isn't this any different than an action that is started on the basis of three theories, all of them intensely litigated, but the plaintiffs prevail on only one of them? Well, they took a risk at the outset by taking a case on what would be wrong with awarding them the full amount of their fees, even though a lot of their work would have been ultimately looked at from the future in vain. Well, your Honor, it's only because of the limiting factor of the lodestar crosscheck on the back end. In the Walmart case, the request there was for only a 10% fee on, I believe, a $6 billion recovery, but Judge Gleeson looked at the lodestar and said, wait a second, that's a multiplier of 10, that's absurd, he called it. And I think when you're starting to push up to those numbers, then regardless of what the percentage, what percentage you might have picked out based on prior comparator cases, you have to then adjust the percentage down because it's just too much of a windfall. That's the whole megafon rule. This is one of the biggest megafons this circuit has ever seen, and therefore there is the danger of overcompensation and a windfall. The B2 time can be recovered in the Berry case, which proceeds below, and it's continuing when there is a settlement there. How can that be? There can be different lawyers. Those lawyers can't charge for the time that these lawyers expended. I don't know why not. I don't know why these lawyers put in a fee petition for their time spent prior to 2016 bringing the case to that point. Indeed, most of the benefits were according to the class counsel obtained prior to that. They remain in place, there's no guarantee. The settlement would probably lock them in as it did last time, but it was these lawyers' work that created the B2. Again, you're arguing for the 2016 cutoff which does seem arbitrary. That was based on when we issued an opinion. I'm arguing a cutoff for their time? You're arguing for a cutoff for 2016 and you're saying those charges should be folded into the charges that are wrapped up in the in the injunctive class. Only the B2 time and the extrajudicial time. Let me be clear, I believe there was some B3 time prior to 2016 it would have been nice if class counsel had let the court know exactly what those hours were. It's clear to me that not all of them were obtaining that monetary recovery and if the Lodestar were limited to the proper B3 hours then the B3 class would maximize their tax recovery. Whereas here they're paying all the fees because perhaps class counsel doesn't perceive a way of getting paid for that work through the Berry action and that's why they're claiming it here. Very clearly it wasn't related to the litigation of the damages class action and in fact the court said in her opinion that in some ways the injunctive release made the damages case harder to prove and litigate because the more legislative changes you get that kind of ameliorates the damages to a certain extent. For example surcharging, a business that can surcharge wouldn't suffer any damages going forward. So there are things that have changed that make the landscape harder to prove for the damages class and I believe that's why they've come back with an inferior settlement here to the one that they had in 2012. Now on the incentive awards I believe just briefly that the Milito case I understand that was decided by a panel of this court. However, the court did not say what the, it claimed that there were facts that distinguished trustees and pettits from that case. It didn't identify what those facts are. I believe this case is factually almost identical to that case in that it put Lee plans here at least to some of them. Factually identical to what case? Trustee V. Greenough. Because the plaintiff here, at least two of them, photos, etc. and traditions are essentially, they're asking for the classic salary for their time, not necessarily even spent on litigation tasks, which is exactly what the trustee in Greenough requested for his personal time, travel time, that sort of thing. Is Milito wrong? Well, to the extent Milito was holding that this, what we're confronting here, the incentive award of Milito, it's a nominal amount, you know, typically between $2,000 and $10,000. It's just, it's not for your time. It's not based on an hourly rate for time extended. It's just to kind of commemorate your stepping forward and representing the class. That would be okay. Well, I believe if it was $10,000. To the extent of distinguishing Milito, yes. If that's what they meant, then that's what they held. I don't believe that's consistent with trustees, but it certainly doesn't bind this case, because in this case, it's not consistent with trustees. Trustees, that's the Supreme Court. Right. I believe Milito was wrongly decided, but we're stuck with it because there was no exception in trustees, but then again, the incentive award is a new creation that the Supreme Court didn't talk about in trustee. There, we're confronting a classic salary. Lead plaintiff enumerated his hours as if he were an attorney and asked for a payment, and that's what Goldstone did. 4,680 hours updating his social media and doing PR isn't, you know, if he had just asked for $10,000 like typical consumer plaintiffs get, then maybe there wouldn't be an issue here, and some of the businesses that were lead plaintiffs, they documented their time as if this were a PSLRA case in terms of the lost hours and the employees that were devoted to discovery. Again, you know, this isn't PSLR, this isn't a securities case, so I don't know that there's any authorization for that either, but at least there, there was something documented that had a direct relationship to the B3 recovery. Thank you. We'll turn to the appellees now. We'll hear first from the plaintiffs. Mr. Coughlin? Yes. Patrick Coughlin on behalf of the class plaintiff appellees. I think that you're right. It's not a question of Article 3 standing. It's a question of antitrust standing because if you are the first payer and you pass it on, maybe you pass it on and somebody else has the recovery because they are a cost plus like Jackrabbit. Well, that doesn't mean the first person, the first entity doesn't have Article 3 standing, but as a rule of law applied in that context, the exception allows it to be passed on. But if I could step back for a second, you'd ask some questions about the application of Illinois BRIC here. And I think what we've passed up is that we have to first, this is a price fix case, so we have to first look at what is the product that is being sold and the super competitive fee that is being charged. And here it's network services. And they're referred to in the complaint, the operative complaint, as card accepted services. Those are the contracts and hence the definition, those that accept Visa and MasterCard. That's what's being sold here. Those services include the authorization, the clearance and the settlement of transactions between merchants and banks. So that's if we focus on what the product is and then we apply Illinois BRIC and I think it is a factual issue, apply that and see who the first payer for those services. It's the merchant in the first instance purchasing the card accepted services because that merchant must accept the network's rules, the no discount rule, the honor our cards rule, the no surcharge rules and agree to pay the fee, the interchange fee, to get access to those card accepted services. Now it may be, it may be the gas station that has that relationship with the network and it may be the oil companies that have it. And it's a factual issue. It's mainly governed by what the transaction records that are produced by the networks and the processors, which we subpoenaed here. And so it's an objective criteria which will determine who is the first payer, who is the closest to the network. It doesn't mean... What if hypothetically an acquiring bank were to file a claim and say we're the first payers. Would they be able to have their claim processed in this and what would happen? Well, no. They're part of the network. They've signed an agreement not to sue Visa, NASCAR or other entities in the networks. So they have taken... So that can't happen here. Okay. And of course we always disagreed with their position that it was the acquirers that were the first payers. And we only brought this case... But if they've signed an agreement, then we don't have to worry. And we only brought this case on direct payer merchants under federal law. Council brought up the Cartwright Act claim, the California Cartwright Act claim. But we brought a nationwide class on behalf of merchants that directly pay the fee. You can't bring a Cartwright Act claim, a California Cartwright Act claim for a nationwide class of indirects. Under the Qualcomm case, you can't bring such a claim. We did not bring a claim. Indirects are not mentioned at all in our case. We brought the Cartwright Act claim not to cover indirects, but to cover the situation that might arise, and actually did here, of a potential conflict with a direct plaintiff claim in California, suing for California residence and suing Visa, which is located in California. And that happened here. While we were up here on appeal, the nuts and case candy was filed on behalf of direct purchasers in California against Visa, and it was non-removable. And yet they pulled it in here, and so they're part of this, because we had that claim that covered those same transactions for a nationwide class, but only for directs. And I think once we focus on the right transaction, that is the sale of the processing services, the network machinery, the authorization, the clearance, and the settlement of transactions, and you pay the super competitive fee, but you have to accept all the rules, the no surcharge rule, the no discount rule, and those rules, and then you can properly focus in on who the proper merchant is to make this claim in the first instance. And what FITES does is they point to the transaction where the customer presents the card to the gas station. That's not the transaction that's at issue here. That's not the product that's being sold here that is the subject of this price fixing antitrust case. The product that's being sold is the processing services, and it's that merchant that is accepted in the first instance. Now, they're called card acceptance services. You said that it might be the service station or it might be the auto company. Yes, a lot of service stations, sometimes the unbranded ones, and sometimes maybe even the branded ones, have their own deal with the network. And that's just a fact from mine. The class definition as a legal matter does not change. But the special master can look and say, oh, in this instance, perhaps, in this instance, it is the gas station that has a relationship with their client bank. Maybe to a third-party processor. But that is the relationship. It's a factual issue. Your Honor asks, well, could it be a factual issue on this cost plus that Jack Bradley is facing? I think it could be. If we're going to apply the antitrust laws here to the direct payer, then the exceptions should apply. And a special master can make that determination. But it's not a subjective determination. Jack Bradley has to satisfy that it actually has a cost plus contract with the oil supplier for those stations that don't have a direct relationship. These aren't complicated issues. And we have records, objective records, to show you. This issue came up in 2014 and we didn't address it. This issue came up in 2004 and 2005 in the Visa Check Matter where FIPE's counsel here was co-counsel in that matter. They put in a letter and suggested that this very issue for all buy a special master. So it didn't come up in 2014. It's always going to be an issue in an antitrust case because in an antitrust crisis case sometimes there's a long chain and sometimes there's exceptions to that chain. It seems simpler to me and maybe I just don't understand it, but the anti-steering rule, the no surcharge rule, the no discount rule, all of this, all of these rules bite right at the gas station. I drive my car in, I offer to pay a little less and not use my car. They can't allow that under the rules. All of these rules which support the judgment of the damages in this case, all of those rules apply at the gas station and it's the gas station owner who is barred by these rules who can avoid paying these fees. It seems to me that we're looking at a gas station owner and not the oil companies. Isn't that a simple solution to the whole thing? Well, in the first instance let's take where the oil company has a relationship in the first instance with the network and that they sign up for the processing services, agree to pay the fee and abide by the rules. Well, the oil companies aren't selling gas so they're not really have to follow those rules, but then they have to contract they have to contract with the branded station that the branded station follows those rules and the branded station may well as Jack Rabbit argues, pay the entire fee and they may be the proper plaintiff under a cost plus contract here, but antitrust Illinois says it's the first in line contract, but there are exceptions as Your Honor pointed out and as Jack Rabbit argues and as it is enforced ultimately of course the consumer pays so in any antitrust price fixing case there's just a long chain. Sometimes there's two or three people in the chain. Sometimes there's ten entities in the chain as the product gets implemented in something else and here with the simple case that Your Honor offers there's an oil company that may bind themselves in the first instance to bind any of their people that they sell the gas to that they accept the cards and process those cards for, you know, to be bound by those rules and they may be a direct purchaser under an exception or they may be an indirect purchaser. Right now down below... And how is the special master going to figure that out? By looking to see who has the relationship in the first instance and is bound and that may well be the oil company. Working in the contract? It's easier than that. The records from Visa and to a lesser extent MasterCard but also the processors will tell you which entity has the relationship in the first instance with the acquirer and bank. But if it's not as clear or the gas station has to come in and present the records like they do in many class actions, you know, then it becomes it will become clearer and the special master can make that determination. This issue did come up in VisaCheck and it came up less than a dozen times as we understand it. It was resolved in about three or four instances as we understand it and as you said it resolved thousands of potential issues the decisions on those issues. And so it came up in this very context, in this very case and this very court has accepted this definition of this direct purchaser merchant class in three other matters. Your Honor did it in USA versus Visa and accepted this definition and then twice in VisaCheck and Walmart cases. First at the certification level and then at the settlement level. And then special master was appointed, undertook this review and three billion dollars was distributed. So not only do we have ascertainability but we also have administrative feasibility which is not required here. Rarely do we have a situation where this has already occurred all the way through the matter. So we think that this class is very ascertainable okay, contrary to what we've heard today under objective criteria as the district court found and that it is the first payer, the direct payer of the fee. Now I started to say something about the old Jericho case. There is an indirect purchaser case that's been pending down below in 7B20 and FIPE's counsel has asked that case to be stayed pending the resolution of this one because they want to seek a lead role, a lead counsel role in that case and so that case has been stayed pending the outcome here. So it comes back to the issue is there can be a long chain in any antitrust cost fixing case and here I don't think it's an article 3 standing matter I think it is an Illinois brick standing matter and I think we have that here. So I have a question to ask you about the fairness of the settlement with respect to a certain kind of litigant. If a owner of a gas station owns both gas stations that sell the branded gas of an integrated oil company and also sells gas that is not the branded gas of an integrated oil company and Illinois brick and let's say that Illinois brick is applied in a manner here with respect to the branded gas selling that deems the oil company to be the first purchaser rather than the service station to be the first purchaser of the credit card services then according to the definitions of the settlement that plaintiff will be the part of the settlement with respect to the stations that are not selling branded gas but as to the stations that are selling branded gas will be excluded from the class but to the extent that there are benefits to being excluded from the class which means that you can then sue in state court sue for state law remedies for example that entity will nonetheless be precluded from doing so because by virtue of being the preferred party the first in line as to some of the stations it will be a releasing party and it therefore is cut out of the possibility for all the stations that sell branded gas from resorting to state law remedies. Isn't that correct? That's absolutely correct. That is a choice. Why isn't that an unfair settlement because supposing that the person has only one or a tiny number of service stations which places him in line to be in the class and most of them are exclusions is nonetheless the person is precluded from in any way recovering for the violation in respect to the great majority of the stations. In almost all price-fixing antitrust cases an entity will have maybe they have all direct claims maybe they have the majority of direct claims and maybe it's even 50-50 and in all antitrust price-fixing cases when that claimant comes in that claimant I don't know of an exception is always asked to give up all their claims if they're going to put in for their direct claims. Why wouldn't it be a very simple matter to allow that claimant to wear two hats to be, in other words to be deemed as suing in two different capacities one with respect to the branded gas stations and the other with respect to the other gas stations so that the person will be a class member with respect to subclass A and not be a class member with respect to subclass B. Because often the defendants demand a release from somebody who's making a claim for any and all claims they may have direct, indirect, injunctive, equitable ... ... ... ... ... ... ... They're making a weighing choice in the first instance they're weighing, let's say they're direct claims versus indirect. Nine times out of ten the majority of your claims are one way or the other they're not mixed, but you may have some that fall into this bucket or this bucket and you give them up. In the Visa check and Walmart cases, you approve the release not only of all the direct federal claims but this court approved the release of all state and all equitable claims. This same case for this same class, they have the same release that you're talking about and arguing that somehow it's inequitable or not it's not fair it's a choice that people make, but the remedy is they make that choice or they can opt out in the cases before, the cases you were worried about ...